## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

A.M., on behalf of her minor child F.M.,

       Plaintiff,

v.                                                                    Civ. No.13-356 MV/LAM

ANN HOLMES,

       Defendant.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Holmes' Motion for Summary Judgment on the Grounds of Qualified Immunity and Collateral Estoppel [Doc. 17].   The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, finds that Defendant's Motion is well-taken and will be granted.

### BACKGROUND

"The facts supported by evidence, [viewed] in the light most favorable to [Plaintiff]" as the party opposing the summary judgment, are as follows.[1]  *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 662 (10th Cir. 2010).   In May of 2011, F.M. was a seventh grader at APS Cleveland Middle School.   Doc. 17 at 4.   On May 19, 2011, F.M. attended Margaret Mines- Hornbeck's PE class, which was being held in a classroom.   *Id.*   During the class, Ms. Mines-Hornbeck used a handheld radio to call for assistance in managing F.M., who she reported was being disruptive in her class.   *Id.*   Officer Art Acosta, the Albuquerque Police Department officer assigned to

---

[1] In her response in opposition to Defendant's motion, Plaintiff states that she disputes the majority of the facts as set forth in Defendant's statement of undisputed facts.   A careful reading of Plaintiff's response, however, makes clear that Plaintiff does not offer conflicting evidence that creates a dispute of material fact, but rather offers supplemental facts, characterizations of the facts presented in Defendant's motion, and conclusions she seeks the Court to draw from the facts.   To the extent that there is a dispute as to material facts, the Court has construed those facts in the light most favorable to Plaintiff.   Further, the Court has included in its statement of the facts the supplemental facts presented by Plaintiff, to the extent those facts are relevant.

Cleveland Middle School, responded to Ms. Mines-Hornbeck's call.   *Id.*   Ms. Mines-Hornbeck told Officer Acosta that F.M. had disrupted her class by burping.   *Id.*   Officer Acosta placed F.M. under arrest, and transported him to the Juvenile Detention Center.   *Id.* at 5.   Shortly after it occurred, in May of 2011, the media covered the story of F.M.'s arrest for burping.   *Id.*   F.M.'s mother, A.M., spoke publicly about F.M.'s arrest and provided interviews to local news media. *Id.*

According to Officer Acosta, the media report "really bothered the administration.   It bothered LaBarge.   It bothered a lot of the teachers.   I know Ms. Mines-Hornbeck was really upset."   Doc. 26 at 6.   Officer Acosta further explained that Principal LaBarge was upset because "Cleveland had just got an award . . . and I remember Ms. Labarge was very upset over the fact. She's saying, you know, 'there's been no coverage of this.'"   *Id.*

Thereafter, in August 2011, F.M. was enrolled in APS Cleveland Middle School as an eighth grader.   *Id.*   On November 8, 2011, a student reported that she had witnessed a drug transaction on school premises.   *Id.*   Officer Acosta obtained the security footage of the hallway in order to view the alleged drug transaction.   *Id.*   All of the students who were identified on the video as being involved in the alleged transaction were called in one by one for questioning and search.   *Id.*   F.M. was one of those students identified in the video.   Doc. 26 at 3.   Officer Acosta was present for each of the searches of the students.   *Id.*   Cleveland Middle School Principal Susan LaBarge was present only for the questioning and search of F.M.   *Id.*; Doc. 26 at 3.   Assistant Principal Ann Holmes and Officer Acosta were also present for the questioning and search of F.M.

The alleged drug transaction occurred in the morning.   Doc. 23 at 6.   Assistant Principal Holmes approached Officer Acosta two or three hours later.   *Id.*   F.M. was not searched until

2

4:21 p.m. that day, after other students had been searched.   *Id.*   The searches of the other students

allegedly involved in the transaction revealed no illegal narcotics, contraband, or instrumentalities

of narcotics trafficking.   Doc. 23 at 7.

Upon learning that F.M. was one of the students involved in the transaction, Officer Acosta

contacted his supervisor.   *Id.* at 6.   Officer Acosta explained:

> After I processed F.M. at the D-Home [in May of 2011] . . . Mom showed
> up at the school, and she was hot.   She wasn't happy about what had happened . . .
>
> [Assistant Principal] Holmes had called me, and she said, "Can you get
> back over here to the school? F.M. and his mom are here, and she's real volatile.
> She's very, very upset."
>
> So had I gone to go back to the school. . . . And I went to go make contact,
> she already left at that point.
>
> So when I got there, I had actually never actually contacted mom. . . Let's
> shift gears back to November [the November 2011 search].   Because I knew
> obviously it was a very touchy situation.   And . . . the media was having a field day
> with a burping kid in the class and getting thrown down to the grounds by the
> SWAT Team.   They were having their fun with all this stuff.
>
> And we knew that mom was real upset with all this . . . we knew this whole
> thing was still contentious.   So for that reason, when I knew it was F.M., I called
> my supervisor before I ever even talked to him.   I didn't get within 100 feet of the
> guy . . .
>
> I called my sergeant. . . . I didn't even have a lapel camera at the time yet . .
> .
>
> So my sarge said, "Of course make sure everything is documented.   Make
> sure we're running tape," which I was.   "Make sure we have video there."   I did
> not have it.   So Kiel Higgins, who's the SRO at . . . McKinley Middle School, right
> down the road, we elected to have him.
>
> So we wanted to have a video . . . We wanted to have video of this so we
> could show what was or what was not done.   And that's why he [Officer Higgins]
> was there.

*Id.* at 6.   Officer Acosta also testified:   "For the reasons of everything that happened in May, the

idea was we're going to make sure we cross our Ts and dot our Is on this go-round."   Doc. 23 at 6.

Officer Acosta made audiotape recordings of the interviews of some or all of the students involved in the alleged transaction.   *Id.*   F.M.'s interview was videotaped.

The search of F.M. was conducted by and in the presence of five adults, two of whom are female and two of whom are police officers.   Doc. 23 at 7.   The school was not able to get in contact with F.M.'s mother before the search, and had no record of his father.   *Id.*   Before any search of his clothing, F.M. was found to be in possession of $200 in cash, a red bandana and a marijuana leaf belt buckle.   Doc. 17 at 7.   The bandana and buckle were found in F.M.'s backpack.   Doc. 23 at 7.   When F.M. was searched, he was wearing multiple layers of clothing, to wit: a pair of jeans, two pairs of basketball shorts, a pair of boxers, a long sleeved shirt and a short sleeved shirt over it.   Doc. 17 at 7.   F.M. was asked to remove his pants and one pair of shorts, and one of his shirts.   While standing in one shirt, a pair of boxers and one pair of gym shorts, he was asked to flip the waistband of his boxers.   Doc. 23 at 7.   A teacher, Mr. Jeniski, then was asked to look in (by physically touching/manipulating) F.M.'s waistband in the presence of Principal LaBarge and Assistant Principal Holmes.   *Id.*

F.M. had never been implicated in a drug transaction prior to the alleged transaction at issue here, despite the fact that there have been many issues with drugs at Cleveland Middle School.   *Id.* at 8.   Further, prior to the events of November 8, 2011, Defendant and the school administration had no negative contact with F.M. during the 2011 to 2012 academic year.   *Id.*

On November, 30, 2011, Plaintiff filed a Complaint against Principal LaBarge, Ms. Mines-Hornbeck and Officer Acosta (the "Prior Action").   *See A.M. v. Principal Susan LaBarge, et al.*, 12-cv-74 RB/ACT (D.N.M.), Doc. 1.   Assistant Principal Holmes was not named in the Complaint in the Prior Action.   In the Prior Action, Plaintiff asserted two claims, arising from

both the May 19, 2011 arrest of F.M. by Officer Acosta, and the November 8, 2011 search of F.M.

by Principal LaBarge:   (1) Fourth Amendment violations:   unlawful arrest, excessive force, and

unlawful strip search; and (2) Violation of the Fourteenth Amendment:   *de facto* expulsion from

school without procedural due process.

On January 24, 2013, Plaintiff voluntarily dismissed all claims against Ms.

Mines-Hornbeck.   *Id.*, Doc. 44.   On January 29, 2012, Plaintiff voluntarily dismissed all claims

against Principal LaBarge as they related to the May 19, 2011 arrest.   *Id.*, Doc. 45.   Principal

Labarge moved for summary judgment as to the remaining claims against her on the grounds of

qualified immunity.   *Id.*, Doc. 29.

On April 4, 2013, the Court entered summary judgment in Principal LaBarge's favor as to

all remaining claims, *i.e.*, the claims related to the November 8, 2011 search of F.M. and the

alleged due process violations.   Doc. 53.   With respect to the November 8, 2011 search of F.M.,

the Court held that "the search was justified at its inception" and "reasonable in scope."   *Id.* at 8-9

("As the search was justified at its inception and conducted in a manner that was reasonably related

in scope to the circumstances which justified the search in the first place, Defendant LaBarge is

entitled to summary judgment on the Fourth Amendment claim.").   The Court also held that

Principal LaBarge was entitled to summary judgment on Plaintiff's due process claims, which

related to F.M.'s suspensions.   Plaintiff's claims against Officer Acosta arising out of the May 19,

2011 arrest are still pending.   Accordingly, there has been no final judgment entered in the Prior

Action sufficient to trigger Plaintiff's right to appeal.   Doc. 23 at 6.

On February 28, 2013, F.M.'s mother, on behalf of F.M., commenced this action in New

Mexico state court against Assistant Principal Holmes.   Doc. 1-1.   On April 15, 2013, Defendant

removed the case to federal court.   Doc. 1.   In her three-count Complaint for Recovery of

Damages Due to Deprivation of Civil Rights, Plaintiff alleges that Assistant Principal Holmes: (1) conducted an unlawful search of F.M. in violation of the Fourth Amendment; (2) retaliated against F.M. in violation of the First Amendment for his mother's decision to speak to the media about F.M.'s May 19, 2011 arrest; and (3) violated F.M.'s right to equal protection under the Fourteenth Amendment by treating him, during the search, differently from similarly situated students.

On June 17, 2013, Defendant filed the instant motion for summary judgment.   Doc. 17. Plaintiff filed a response in opposition on July 12, 2013.   Doc. 23.   Defendant's reply followed on July 29, 2013.   Doc. 26.

## DISCUSSION

Defendant seeks summary judgment on the basis of collateral estoppel or, in the alternative, on the basis of qualified immunity, as to Plaintiff's Fourth Amendment unlawful search claim.   Defendant also seeks summary judgment on the basis of qualified immunity as to Plaintiff's First Amendment retaliation claim.   Finally, Defendant seeks summary judgment as to Plaintiff's Fourteenth Amendment equal protection claim on the basis that, as a matter of law, Plaintiff cannot establish an essential element of that claim, namely, that Defendant treated F.M. differently from other similarly situated students.

I.    Legal Principles

A.    Collateral Estoppel

Collateral estoppel, or issue preclusion, "bars a party from relitigating an issue once it has suffered an adverse determination on the issue, even if the issue arises when the party is pursuing or defending against a different claim."   *Park Lake Res. Ltd. Liab. Co. v. U.S. Dep't of Agric.*, 378 F.3d 1132, 1136 (10th Cir. 2004).   Collateral estoppel will bar a claim if four elements are met:

(1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

*Frandsen v. Westinghouse Corp.*, 46 F.3d 975, 978 (10th Cir. 1995).   In order to invoke collateral estoppel, the parties need not be the same, and there need not have been a final judgment on the merits in the first action.   *Id.*; *McNally v. Colo. State Patrol*, 122 F. App'x 899, 902, 2004 WL 2445576 (10th Cir. 2004); *see also Siemens Med. Sys., Inc. v. Nuclear Cardiology Sys., Inc.*, 945 F. Supp. 1421, 1432-36 (D. Colo. 1996) (treating order granting partial summary judgment as final); 18A Charles Alan Wright et al., Fed. Practice & Procedure § 4434 ("Recent decisions have relaxed traditional views of the finality requirement by applying issue preclusion to matters resolved by preliminary rulings[.]").   Rather "an issue is barred from relitigation by issue preclusion when the issue was actually and necessarily decided in a prior case and the party against whom issue preclusion is invoked has had a full and fair opportunity to litigate the issue to be precluded." *McNally*, 122 F. App'x at 903.

   B.    Qualified Immunity

   The affirmative defense of qualified immunity arose to address the fact that, "[a]lthough actions for damages provide an important remedy for individuals injured by governmental officials' abuse of authority, such actions sometimes subject officials to costly and harassing litigation and potentially inhibit officials in performing their official duties."   *Gross v. Pirtle*, 245 F.3d 1151, 1155 (10th Cir. 2001).   To balance these competing interests, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law."   *Id.* (citation omitted).   Qualified immunity affords "broad protection, . . . giving officials a right, not merely to avoid standing trial, but also to avoid the burdens of such pretrial matters as discovery."   *Id.*

7

(citation omitted).   Thus, "courts should resolve the purely legal question raised by a qualified immunity defense at the earliest possible stage in litigation."   *Id.* (citation omitted).

In keeping with the purposes of qualified immunity, "special rules apply when an official raises a defense of qualified immunity on summary judgment."   *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 779 (10th Cir. 1993).   Specifically, "qualified immunity requires a two-step sequence."   *Morris v. Noe*, 672 F.3d 1185, 1191 (10th Cir. Feb. 27, 2012) (citation omitted).   "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established."   *Id.* (citation omitted).   "If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity."   *Gross*, 245 F.3d at 1156.   The Court has "the freedom to decide 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'"   *Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223 (2009)).   Although the Court views the evidence in the light most favorable to the nonmoving party, "the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity."   *Gross*, 245 F.3d at 1156.

"A constitutional right is clearly established when, at the time of the alleged violation, the contours of the right were sufficiently clear that a reasonable official would understand that [her] actions violate that right."   *Lundstrom*, 616 F.3d at 1118-19 (citation omitted).   "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition."   *Fisher v. City of Las Cruces*, 584 F.3d 888, 900 (10th Cir. 2009) (citation omitted).   Accordingly, a "plaintiff must do more than identify in the abstract a clearly established right and allege that the

8

defendant has violated it." *Lundstrom*, 616 F.3d at 1119.   Specifically, a "plaintiff must show legal authority making it apparent that in light of pre-existing law a reasonable official would have known that the conduct in question violated the constitutional right at issue." *Id.*

This does not mean that the plaintiff must "present a case with an identical factual situation." *Id.*   To the contrary, the Supreme Court has made clear that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).   The "salient question" thus is whether the state of the law at the time of the alleged misconduct gave the defendant "fair warning" that her alleged misconduct was unconstitutional. *Id.*   In order to answer this question, the Court looks to "Supreme Court or Tenth Circuit precedent on point or clearly established weight of authority from other courts finding the law to be as the plaintiff maintains." *Lundstrom*, 616 F.3d at 1119.

   C.    Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a); *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1290 (10th Cir. 1999).   "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).   Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993) (citations omitted).   The moving party need not negate the nonmovant's claim, but rather must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex*

9

*v. Catrett*, 477 U.S. 317, 325 (1986).   Once the moving party meets its initial burden, the nonmoving party must show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."   *Applied Genetics Int'l Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1991) (citation omitted).   The nonmoving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment, *see Pueblo v. Neighborhood Health Ctrs., Inc.*, 847 F.2d 642, 649 (10th Cir. 1988), but rather must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citation omitted).

Upon a motion for summary judgment, the Court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence."   *Kaus v. Standard Ins. Co.*, 985 F. Supp. 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998).   If there is no genuine issue of material fact in dispute, then a court must next determine whether the movant is entitled to judgment in its favor as a matter of law.   *See, e.g.*, *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

II.   <u>Instant Motion</u>

A.   <u>Fourth Amendment Unlawful Search Claim</u>

In Count I, Plaintiff alleges that Defendant's search of F.M. was in violation of the Fourth Amendment.   In the Prior Action, Plaintiff made the same allegation – that the search of F.M. was in violation of the Fourth Amendment – against Principal LaBarge.   Principal LaBarge moved for summary judgment on the Fourth Amendment claim and, after briefing by both parties, the Court granted summary judgment in favor of Principal LaBarge.   Defendant argues that Plaintiff is barred under the doctrine of collateral estoppel from relitigating her Fourth Amendment claim.   In

10

the alternative, Defendant argues that she is entitled to qualified immunity on Plaintiff's Fourth

Amendment claim, as she did not violate a clearly established right by searching F.M.   On the

other hand, Plaintiff argues that collateral estoppel cannot be invoked against her because the

issues in the Prior Action and this action are not identical, there has been no final adjudication of

the Prior Action, and Plaintiff did not have a full and fair opportunity to litigate the issue raised in

this action.   Plaintiff further argues that Defendant is not entitled to qualified immunity, as the

search was unreasonable under clearly established law.

### 1.   Collateral Estoppel

All of the elements necessary to invoke collateral estoppel are met here.   First, it is

undisputed that Plaintiff, the party against whom the doctrine is invoked, was a party to the Prior

Action.   Second, although there has been no final *judgment* in the Prior Action, the Court finally

adjudicated, on the merits, Plaintiff's Fourth Amendment claim.   As noted above, there is no

requirement that there be a final judgment on the merits for the doctrine of collateral estoppel to

apply.   The only claims as to which the Court did not render a final decision are unrelated claims

against Officer Acosta.   The Court granted summary judgment on Plaintiff's Fourth Amendment

claim, the only claim as to which Defendant now seeks issue preclusion.   Under these

circumstances, the Court's summary judgment order is sufficiently firm to be accorded conclusive

effect.

Third, the issue previously decided, namely, whether the search of F.M. was reasonable

under the Fourth Amendment, is identical to the one presented in this action.   F.M. was subject to

one search, undertaken by several individuals, including Defendant and Principal LaBarge.   In the

Prior Action, the Court determined that the search was both reasonable at its inception and

reasonable in scope.   Despite the fact that there was one search, presumably undertaken based on

the collective knowledge of those who decided to conduct the search, Plaintiff argues that her claims are distinct because they are asserted against different individuals who were in possession of different information at the time of the search.   Specifically, Plaintiff argues that, prior to the search of F.M., Defendant had information that Principal LaBarge did not have that made it unreasonable for Defendant to conduct the search.

As an initial matter, the fact that identical claims are asserted against different individuals is of no moment.   Further, the undisputed evidence demonstrates that, before the search of F.M., Principal LaBarge and Defendant actually were in possession of the same information. Specifically, Principal LaBarge met with Defendant and learned that the searches of the other students had not turned up evidence of drugs, and she also watched the video of the alleged drug transaction along with Defendant.   It was their shared information, namely the anonymous student tip of a drug transaction, the security footage of the transaction, which included F.M., and the $200 in F.M.'s pocket, upon which the Court based its decision in the Prior Action that the search of F.M. was reasonable.   Accordingly, there is no substantive distinction between the issue previously decided – the lawfulness of the search of F.M. – and the issue presented in this action – the lawfulness of the search of F.M.

Finally, Plaintiff had a full and fair opportunity to litigate the relevant issue, namely, the reasonableness of the search of F.M.   The Court issued its opinion in the Prior Action only after Plaintiff was allowed the opportunity to file a response brief.   Plaintiff was afforded a full and fair opportunity to present her arguments as to why the search was unlawful.   Because the Court's opinion was entered only after consideration of Plaintiff's arguments regarding the unlawfulness of the search of F.M., the "full and fair opportunity to litigate" element is satisfied.

12

2.     Qualified Immunity

Even if collateral estoppel did not bar Plaintiff from relitigating her Fourth Amendment claim, dismissal of that claim would be required because Defendant did not violate a clearly established right in searching F.M.   "The Fourth Amendment 'right of the people to be secure in their persons . . . against unreasonable searches and seizures' generally requires a law enforcement officer to have probable cause for conducting a search."   *Safford Unified Sch. Dist. #1 v. Redding*, 557 U.S. 364, 369 (2009).   In *New Jersey v. T.L.O.*, 469 U.S. 325 (2008), the Supreme Court "recognized that the school setting 'requires some modification of the level of suspicion of illicit activity needed to justify a search,' and held that for searches by school officials 'a careful balancing of governmental and private interests suggests that the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause.'"   *Redding*, 557 U.S. at 370 (quoting *T.L.O.*, 469 U.S. at 340-41).   The Court thus has "applied a standard of reasonable suspicion to determine the legality of a school administrator's search of a student, and has held that a school search 'will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.'"   *Redding*, 557 U.S. at 370 (quoting *T.L.O.*, 469 U.S. at 342).   The required knowledge component of reasonable suspicion for school searches is "a moderate chance of finding evidence of wrongdoing."   *Redding*, 570 U.S. at 371.

In *Redding*, the Supreme Court applied this legal standard to consider the constitutionality of the search of a student who was suspected of distributing prescription Ibuprofen.   After one student, Marissa, told the assistant principal that another student, Savana Redding, had given her "IBU 400s," the assistant principal called Savana into his office and showed her a day planner that had been taken from Marissa, which contained various contraband items.   Their conversation

established that Savana and Marissa were on friendly terms; while she denied knowledge of the

contraband, Savana admitted that the day planner was hers and that she had lent it to Marissa.   The

assistant principal had other reports of their friendship from staff members, who had identified

Savana and Marissa as part of an "unusually rowdy" group at a school dance, during which alcohol

and cigarettes were found in the girls' bathroom.   The assistant principal had reason to connect

the girls with this contraband, as another student had told him that he had been at a party at

Savana's house where alcohol was served.

     The Supreme Court held that "Marissa's statement that the pills came from Savana was []

sufficiently plausible to warrant suspicion that Savana was involved in pill distribution."   *Id.* at

363.   The Court further held that this suspicion of the assistant principal's "was enough to justify

a search of Savana's backpack and outer clothing."   *Id.* at 373.   Specifically, the Court explained:

> If a student is reasonably suspected of giving out contraband pills, she is reasonably
> suspected of carrying them on her person and in the carryall that has become an
> item of student uniform in most places today.   If Wilson's reasonable suspicion of
> pill distribution were not understood to support searches of outer clothes and
> backpack, it would not justify any search worth making.   And the look into
> Savana's bag, in her presence and in the relative privacy of Wilson's office, was not
> excessively intrusive, any more than Romero's subsequent search of her outer
> clothing.

*Id.* at 374.

     The Court went on to hold, however, that the further search of Savana, in which she was

made to remove her clothes down to her underwear and then "pull out" her bra and the elastic band

on her underpants, so that her breasts and her pelvic area were exposed, was not reasonable.   The

Court explained that "the content of the suspicion failed to match the degree of intrusion."   *Id.* at

375.   The Court made clear that "the *T.L.O.* concern to limit a school search to reasonable scope

requires the support of a reasonable suspicion of danger or of resort to underwear for hiding

evidence of wrongdoing before a search can reasonably make the quantum leap from outer clothes and backpacks to exposure of intimate parts." *Id.* at 377.

Plaintiff argues that, under *Redding*, Defendant subjected F.M. to a "strip search" in which the degree of intrusion did not match the content of the suspicion of F.M.'s involvement in a drug transaction, and thus violated a clearly established right.   The Court cannot agree, as the search of F.M. was not a strip search akin to the one in *Redding*.   While he was directed to remove some layers of his clothing, F.M. remained in a pair of gym shorts over a pair of boxer shorts and a shirt throughout the duration of the search.   A teacher looked in his waistband, but neither the removal of F.M.'s top layers of clothing nor the flipping of his waistband exposed his intimate parts. Accordingly, the search of F.M. was more akin to the first step of the search of Savana in *Redding*, which the Court unequivocally found to be supported by reasonable suspicion.

Just as the suspicion of Savana's involvement in pill distribution was sufficient to warrant the search of her backpack and outer clothing, so too was Defendant' suspicion of F.M.'s involvement in drug distrubtion sufficient to warrant the search of his backpack and outer layers of clothing.   Specifically, an anonymous student reported witnessing what she believed to be a drug deal; upon review of a security video, Defendant observed F.M. and other students passing something around, and observed F.M. holding what appeared to be money; two students involved in the incident reported that they saw marijuana, and one student reported that she saw F.M. with money; and F.M.'s $200 in cash, red bandana and marijuana belt buckle were discovered prior to the search of F.M.'s clothing.   This evidence warranted suspicion that F.M. was involved in drug distribution, and the look into his backpack and the search of his outer clothing was not excessively intrusive.   Accordingly, F.M.'s right to be free from the search to which he was subjected, in light of the evidence available to Defendant, was not clearly established by *Redding*.

Defendant thus would be entitled to qualified immunity on Plaintiff's Fourth Amendment claim if she were permitted to relitigate it in this action.

       B.    <u>First Amendment Retaliation Claim</u>

In Count II of the Complaint, Plaintiff alleges that, in violation of her First Amendment rights, Defendant searched F.M. in retaliation for Plaintiff's decision to provide a statement to the media about F.M.'s May 2011 arrest by Officer Acosta.   As discussed above, Defendant's search of F.M. was based on reasonable suspicion, and thus did not constitute a Fourth Amendment violation.   Because the search was objectively supported by reasonable suspicion, even assuming *arguendo* that Defendant was motivated by retaliatory animus, the Court finds that would not be enough to violate clearly established law and thus overcome qualified immunity.

In *Reichle v. Howards*, the Supreme Court held that there is no clearly established "First Amendment right to be free from a retaliatory arrest that is supported by probable clause."   132 S. Ct. 2088, 2093 (2012).   Specifically, the Court stated that it has "never recognized" such a right, and that, in the Tenth Circuit, "it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation."   *Id.* at 2093, 2097.   Here, the applicable Fourth Amendment standard is reasonable suspicion, rather than probable cause.   The Court finds that, just as it would not have been clear to a reasonable officer that an arrest supported by probable cause and thus lawful under the Fourth Amendment could give rise to a First Amendment retaliation claim, it would not have been clear to a reasonable school official that a search of a student supported by reasonable suspicion and thus lawful under the Fourth Amendment could give rise to a First Amendment retaliation claim.   Accordingly, the "clearly established" standard is not satisfied here, and Defendant is entitled to qualified immunity on Plaintiff's First Amendment retaliation claim.

C.      Fourteenth Amendment Equal Protection Claim

In Count III of the Complaint, Plaintiff alleges that, in searching F.M., Defendant singled him out and punished him in a manner that was different from other similarly situated students, thereby denying him his right to equal protection under the Fourteenth Amendment.   "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike."   *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).   Because Plaintiff does not claim that F.M. is a member of a protected class, she may bring an equal protection claim on his behalf as a "class of one" only by proving that "he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."   *Rocha v. A. Zavaras, CDOC*, 443 F. App'x 316, 319, 2011 WL 4436254 (10th Cir. 2011).   To do this, Plaintiff "must establish that others, similarly situated in every material respect, were treated differently."   *Id.*   Different treatment of F.M., in and of itself, is not actionable under the Equal Protection Clause unless Plaintiff establishes that "persons who are in all relevant respects alike" were subject to different treatment.   *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 54 (2013).

Defendant argues that Plaintiff has failed to establish either that F.M. was treated differently from the other students involved in the alleged drug transaction, or that F.M. was similarly situated in every material respect to those other students, and thus cannot prove her Equal Protection claim.   On the other hand, Plaintiff argues that "the lack of conclusive video or audio evidence showing that [F.M.] was treated the same [] as all of the other students makes summary judgment in the case inappropriate."   Doc. 23 at 19.   The Court agrees with Defendant that, despite the absence of recordings of the search of the other students, Plaintiff has not carried her

17

burden to prove that Defendant subjected F.M. to a search materially different from that to which similarly situated students were subjected.

First, it is undisputed that each student believed to have been involved in the alleged drug transaction was searched.   Plaintiff has provided no evidence demonstrating that the search of F.M. was materially different from the search of the other students allegedly involved in the search.   Such evidence could have taken many forms, and certainly would not have been limited to recordings of the searches.   Accordingly, Plaintiff has failed to establish, in the first instance, that F.M. was treated differently from the other students.

Further, it is undisputed that, before F.M. was directed to remove the outer layers of his clothing, $200 in cash, a red bandana, and a marijuana belt buckle were discovered in his backpack and on his person.   Plaintiff has provided no evidence demonstrating that the other students who were searched were found in possession of similar items leading to reasonable suspicion of drug distribution.   Accordingly, even assuming *arguendo* that his search was materially different from those of the other students, Plaintiff has failed to establish that F.M. and the other students searched were "in all relevant respects alike."   Because Plaintiff thus has failed to establish that others similarly situated to F.M. in every material respect were treated differently, she cannot establish a "class of one" equal protection claim.

## CONCLUSION

First, Plaintiff is barred from relitigating her Fourth Amendment unlawful search claim under the doctrine of collateral estoppel.   Even if she could assert that claim, Defendant would be entitled to qualified immunity because F.M. did not have a clearly established right to be free from the search to which he was subjected.   Second, Defendant is entitled to qualified immunity on Plaintiff's First Amendment retaliation claim, because it was not clearly established that a search

18

of a student based on reasonable suspicion could give rise to a First Amendment retaliation claim. Third, Plaintiff's "class of one" equal protection claim fails as a matter of law because there is no evidence that, by searching him in the manner that she did, Defendant treated F.M. differently than other students who were similarly situated in every material respect.

**IT IS THEREFORE ORDERED** that Defendant Holmes' Motion for Summary Judgment on the Grounds of Qualified Immunity and Collateral Estoppel [Doc. 17] is granted.

DATED this 31st day of March, 2014.

_____
MARTHA VÁZQUEZ
United States District Judge